**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 33998**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2009 Opinion No. 16 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: March 16, 2009 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| JOEL EVAN BORDEAUX, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Boundary County. Hon. Steven C. Verby, District Judge.

Order of the district court denying motion to suppress, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Eric D. Fredericksen, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent.

_____

GRATTON, Judge

Joel Evan Bordeaux was charged with trafficking in marijuana, I.C. § 37-2732B(a)(1)(B). Bordeaux entered a conditional plea of guilty and contends on appeal that the district court erred in denying his motion to suppress.

**I.**

**FACTS AND PROCEDURAL BACKGROUND**

At approximately 7:00 a.m. on October 9, 2003, a 1985 red Honda with Washington license plates was routinely detained at Porthill, Idaho, a port of entry into the United States from Canada. The vehicle contained two male occupants, driver Scott Scheideman, and passenger Jeffrey Tate. The customs agent, Inspector Zimmerman, assisted by Inspector Whittaker, conducted the "primary interview," and performed a "trunking" of the vehicle, requiring that the trunk be opened for an inspection. The only bag in the trunk was an athletic bag which, upon

1

inspection, contained a pair of women's panties. Inspector Whittaker asked the two individuals some questions and then allowed them to proceed across the border.

Based on a "visceral feeling" about the individuals' responses to his questions and the women's panties in the trunk, Inspector Whittaker suspected that one of the men might have a girlfriend or wife in Canada that he intended to pick up after she had walked across the border at some unregulated point. Inspector Whittaker radioed the United States Border Patrol at Bonners Ferry, Idaho, to notify them of the vehicle and the two men, but did not disclose his suspicion about a potential cross-border romance.

At about 7:10 a.m., Agent Shepard, a senior patrol agent with the Border Patrol, received a radio call that Inspector Whittaker needed to speak with an agent. Agent Shepard called Inspector Whittaker and was notified that two men in a red Honda with Washington license plates had just crossed the border and were headed south on Highway 95. Approximately fifteen to twenty minutes later, Agent Shepard, traveling north on Highway 95, observed a red Honda with Washington license plates drive by with what appeared to be three individuals, and possibly a fourth. He turned his vehicle around and conducted a stop to determine the "immigration status" of the individuals in the vehicle. Scheideman and Tate were seated in the front of the vehicle and Bordeaux was seated in the back of the vehicle next to a dog. Scheideman identified himself as a United States citizen, Tate identified himself as a Canadian citizen, and Bordeaux identified himself as a United States citizen. Agent Shepard asked which of the men had come through the port of entry, and Scheideman and Tate responded that they had. Bordeaux initially responded that he was coming from Coeur d'Alene, but then responded that he was coming from his girlfriend's house in Porthill at the Copeland exit. Bordeaux did not give Agent Shepard the name of the girlfriend or her address. Agent Shepard later testified that Bordeaux's response made him suspicious and also testified that Bordeaux kept his hands in his pockets and did not make eye contact.

Agent Shepard asked the men to exit the vehicle because he was not sure how the dog would react to him reaching into the car to obtain their identification. Agent Shepard elected to do a pat down for his safety and noticed that Bordeaux's boots were damp and had dirt on them. Agent Shepard asked the men to provide some identification, which Scheideman and Tate did to Agent Shepard's satisfaction. Bordeaux provided a business card from a real estate office in Coeur d'Alene containing his name and photo. Bordeaux told Agent Shepard that he had been a

2

real estate agent in Idaho, but he had lost his license for failure to pay his E.E.O. insurance. Agent Shepard testified that he asked Bordeaux for his social security number, which Bordeaux did not provide. Agent Shepard then contacted dispatch and initiated a records check to determine Bordeaux's citizenship using his name and approximate age.

Agent Shepard confirmed that Scheideman was the owner of the vehicle. He asked Scheideman if he could run a drug dog around the vehicle and Scheideman agreed. Agent Shepard radioed for a drug dog, which arrived approximately five or ten minutes later. Also around 7:40 a.m., U.S. Border Patrol Agent Hurst arrived, as well as Idaho State Police Trooper Zimmerman.

Officer Schuman of the Boundary County Sheriff's office and his drug dog conducted a run around the vehicle, while Agent Hurst supervised. As Officer Schuman neared a window of the vehicle, the dog attempted to jump into the car. Officer Schuman put the dog into the front passenger seat and had her sniff the dashboard. Almost immediately the dog jumped into the back seat, pushing her head into the seat trying to get into the trunk. Officer Schuman testified that this was a "significant change in behavior," indicating to him that the dog wanted to get into the trunk. Officer Schuman secured the dog and notified Agent Hurst of their findings.

As Agent Hurst was beginning to open or had already opened the trunk, Bordeaux handed one of the officers a card that stated that he did not waive his right to be free from a search of his person, vehicle, or property. As soon as the trunk was opened, Agent Hurst smelled the odor of marijuana. Inside the trunk was a backpack with an internal frame wrapped in a camouflage rain poncho. Inside the backpack, Agent Hurst discovered sealed bags containing a green, leafy substance, which later tested positive as marijuana. Eleven bags, weighing 1.3 pounds each, were recovered from the backpack. During the procedure using the dog and the subsequent search of the vehicle, Agent Shepard was performing a records check to confirm Bordeaux's immigration status. Bordeaux's status as a U.S. citizen was not determined until Agent Shepard arrived at the jail.

Bordeaux was connected with the backpack, which had not been in the vehicle at the border crossing, and bound over for trafficking in marijuana. He contends on appeal that the stop was not based on reasonable suspicion, that the continued detention was unreasonable and, therefore, that the district court erred in denying his motion to suppress the evidence obtained as a result of the stop and detention.

**II.**

**ANALYSIS**

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

**A.    Search and Seizure**

The Fourth Amendment to the United States Constitution guarantees protection from unreasonable searches and seizures. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *State v. Martinez*, 129 Idaho 426, 925 P.2d 1125 (Ct. App. 1996). The reasonableness standard requires a balancing of the public interest and the individual's privacy interest against governmental intrusion. *Brignoni-Ponce*, 422 U.S. at 878; *State v. Godwin*, 121 Idaho 491, 495, 826 P.2d 452, 456 (1992). Article 1, § 17, of the Idaho Constitution is generally construed consistently with the Fourth Amendment of the United States Constitution; however, we are free to extend greater protections under our constitution than those granted by the United States Supreme Court by the federal constitution. *State v. Thompson*, 114 Idaho 746, 748, 760 P.2d 1162, 1164 (1988).[1] Fourth Amendment protections apply to investigative stops of roving border patrol agents when not at the border or its functional equivalent. *Brignoni-Ponce*, 422 U.S. at 884.

The stop of a vehicle constitutes a seizure of all its occupants and is subject to Fourth Amendment standards. *United States v. Cortez*, 449 U.S. 411, 417 (1981); *State v. Aguirre*, 141 Idaho 560, 112 P.3d 848 (2005). Because a seizure results in restrictions to an individual's

---

[1]    Although Bordeaux contends that both constitutions were violated, he provides no cogent reason why Article I, Section 17 of the Idaho Constitution should be applied differently than the Fourth Amendment to the United States Constitution in this case. Therefore, the Court will rely on judicial interpretation of the Fourth Amendment in its analysis of Bordeaux's claims. *See State v. Schaffer*, 133 Idaho 126, 130, 982 P.2d 961, 965 (Ct. App. 1999).

personal freedom, any individual in a seized vehicle has standing to challenge the validity and reasonableness of the stop. *State v. Haworth*, 106 Idaho 405, 406, 679 P.2d 1123, 1124 (1984). The stop of a vehicle and detention of the driver is generally a detention of any passengers as well and, therefore, passengers also have standing to contest the reasonableness of the detention. *State v. Gutierrez*, 137 Idaho 647, 651-53, 51 P.3d 461, 465-67 (Ct. App. 2002). Any evidence seized pursuant to an unlawful stop or an unreasonable detention is "fruit of the poisonous tree" and is, therefore, inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 487 (1963). Therefore, Bordeaux, as a passenger, has standing in this case to challenge the validity of the stop and the reasonableness of the detention.

### 1. Reasonable Suspicion Justifying Stop

In order to satisfy the Fourth Amendment, any investigatory stop must be based on "a reasonable suspicion supported by articulable facts that 'criminal activity may be afoot . . . .'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The officer "must be able to articulate more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Sokolow*, 490 U.S. at 7). Reasonable suspicion must be based on specific, articulable facts considered with objective and reasonable inferences that form a basis for particularized suspicion. *State v. Sheldon*, 139 Idaho 980, 983-84, 88 P.3d 1220, 1223-24 (Ct. App. 2003). Particularized suspicion consists of two elements: (1) the assessment must be based on a totality of the circumstances, and (2) the assessment must yield a particularized suspicion that the particular individual being stopped is engaged in wrongdoing. *Cortez*, 449 U.S. at 418; *see also Sheldon*, 139 Idaho at 983, 88 P.3d at 1223. The Idaho Supreme Court has adopted this "totality of the circumstances" or "whole picture" approach. *Haworth*, 106 Idaho at 406, 679 P.2d at 1124. An officer may draw reasonable inferences from the facts in his or her possession, and those inferences may be drawn from the officer's experience and law enforcement training. *State v. Montague*, 114 Idaho 319, 321, 756 P.2d 1083, 1085 (Ct. App. 1988).

In the context of a stop effectuated near the border, the United States Supreme Court has stated that the Fourth Amendment "forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." *Brignoni-Ponce*, 422 U.S. at 884. Furthermore, where an officer has reason to suspect that a "particular vehicle

5

may contain aliens . . . he may stop the car briefly and investigate the circumstances that provoke suspicion." *Id.* The Court in *Brignoni-Ponce* stated:

> Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.

*Id.* The Court listed a number of factors that may constitute reasonable suspicion warranting a stop, such as characteristics of the area, proximity to the border, previous experience with alien traffic, information about recent crossings, the driver's behavior while driving, an extraordinary number of passengers, etc. *Id.* at 884-85.

In this case, Bordeaux contends that Agent Shepard did not have reasonable suspicion to believe that the driver was breaking any traffic laws or that the vehicle contained illegal immigrants.[2] As to whether Agent Shepard had a reasonable suspicion that the vehicle contained illegal immigrants, Bordeaux argues that: (1) Agent Shepard acknowledged that he did not verify that the red Honda he was stopping was the same red Honda that had crossed the border earlier that morning, and (2) a third person in the vehicle does not provide reasonable suspicion that one of the occupants is an illegal immigrant due to the time and distance the vehicle had travelled away from the border without any surveillance. We will separately address both of these contentions.

Bordeaux argues that Agent Shepard conceded at the suppression hearing that he did not verify that the red Honda he pulled over was the same red Honda that he had been notified about. Agent Shepard testified at the preliminary hearing that he was told to be on the lookout for a red Honda four-door with Washington plates that was southbound from the Porthill port of entry.[3] He testified that Inspector Whittaker gave him a Washington license plate number and told him that there were two occupants in the vehicle. Agent Shepard testified that as he was going north on 95, he "observed the vehicle" going south at about milepost 519. At that time there were

---

[2]     Agent Shepard testified at the suppression hearing that enforcing traffic laws was not part of his job as a border patrol agent, and that he stopped the vehicle for an immigration check. Thus, reasonable suspicion that the driver of the vehicle was breaking traffic laws is irrelevant, and we will not address it further.

[3]     Counsel for both parties stipulated that the preliminary hearing transcript would be included in the record for the district court to consider on the motion to suppress.

three occupants in the vehicle. Agent Shepard also testified at the suppression hearing that as he was going north on 95, he "observed the vehicle" that Inspector Whittaker had told him about, the red Honda with Washington plates, heading southbound at about Mile Marker 521. We conclude that the district court's finding that the vehicle observed by Agent Shepard matched the vehicle described to him by Inspector Whittaker is supported by substantial evidence in the record.

Bordeaux next contends that a third person in the vehicle does not provide reasonable suspicion that one of the occupants is an illegal immigrant due to the time and distance the vehicle had travelled from the border. Bordeaux argued at the suppression hearing and on appeal that the number of homes between the Canadian border and the location of the stop increase the likelihood that the vehicle simply picked up a third occupant after crossing the border. Nevertheless, while the presence of a third individual in the red Honda may have an innocent explanation, it does not negate the officer's reasonable suspicion that one of the individuals may be an illegal immigrant. *See State v. Rader*, 135 Idaho 273, 276, 16 P.3d 949, 952 (Ct. App. 2000) ("[T]he existence of alternative innocent explanations of the circumstances does not negate the fact that the officer had a reasonable suspicion that a crime might have been committed."). The district court determined that the facts supported Agent Shepard's reasonable suspicion that one of the occupants of the red Honda might be an illegal immigrant. The court stated:

> In this case, fifteen to twenty minutes after the vehicle had crossed the border at Porthill, the border patrol agent observed a vehicle matching the description given to him by the customs inspector, who had requested the agent to check for the vehicle to see if it contained additional passengers. The vehicle was traveling south from the border with an additional passenger or passengers in the vehicle, only minutes after Agent Shepard had received the information. These are 'articulable' facts forming the basis for a reasonable suspicion of criminal activity connected with the passenger having crossed the border illegally. Therefore, the stop was justified.

The findings of the district court are supported by substantial evidence in the record. Agent Shepard had a reasonable suspicion, based upon objective facts evaluated under the totality of the circumstances, justifying the stop in this case.

### 2. Reasonableness of Detention

Having determined that Agent Shepard made a lawful stop, we next determine whether the scope of the investigative detention was "reasonably related to the circumstances that justified the stop." *State v. Martinez*, 129 Idaho at 430, 925 P.2d at 1129. "An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also State v. Aguirre*, 141 Idaho at 563, 112 P.3d at 851. It is the State's burden to establish that the seizure was based on reasonable suspicion and sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Royer*, 460 U.S. at 500. A drug dog sniff is not a search and may be done during an investigative stop, but the use of the drug dog may not lengthen the duration of the stop. *Illinois v. Caballes*, 543 U.S. 405, 409-410, (2005); *see also Aguirre*, 141 Idaho at 563, 112 P.3d at 851. "It is therefore not necessarily a Fourth Amendment violation for an officer who has stopped someone for a traffic violation to ask unrelated questions about drugs and weapons, or to run a drug dog around the perimeter of the vehicle." *Aguirre*, 141 Idaho at 563, 112 P.3d at 851. However, if an officer questions a driver about matters unrelated to the traffic stop after the purpose of the stop has been fulfilled, the questioning, no matter how short, extends the duration of the stop and is an unwarranted intrusion upon the privacy and liberty of the vehicle's occupants. *State v. Gutierrez*, 137 Idaho at 651-53, 51 P.3d at 465-67. Nevertheless, an officer may employ a drug dog while another officer checks for identifying information. *State v. Parkinson*, 135 Idaho 357, 362-63, 17 P.3d 301, 306-07 (Ct. App. 2000).

Agent Shepard testified that he pulled the red Honda over for an "immigration check." Scheideman identified himself as a United States citizen, Tate identified himself as a Canadian citizen, and Bordeaux identified himself as a United States citizen. Agent Shepard then asked for identification, which Scheideman and Tate provided confirming their status. Bordeaux supplied Agent Shepard with a business card from a real estate office in Coeur d'Alene containing his name and photo. Agent Shepard asked for Bordeaux's social security number, which Bordeaux did not provide. Thereafter, Agent Shepard contacted dispatch and initiated a records check to determine Bordeaux's citizenship using his name and approximate age.

While the records check was ongoing, Agent Shepard asked Scheideman if he could run a drug dog around Scheideman's car, and Scheideman agreed. Agent Shepard called for a drug dog. While the drug dog and the other officers were checking the vehicle, Agent Shepard

8

continued the process of checking records to determine Bordeaux's immigration status. Agent Shepard testified that he did not finally confirm Bordeaux's status as a United States citizen until they arrived at the jail, after the marijuana had been discovered. Thus, the detention was not extended by use of the drug dog, as the purpose of the stop, an immigration check, had not been concluded.

Bordeaux finally contends that Agent Shepard made an "initial determination" that Bordeaux was a U.S. citizen based on the presentation of the business card and Bordeaux's explanation of his employment and, therefore, the detention was unreasonable. Bordeaux's assertion, however, is belied by the record. Agent Shepard repeatedly testified that a business card was not satisfactory for him to confirm that Bordeaux was a U.S. citizen. Accordingly, Agent Shepard did not make an initial determination that Bordeaux was a U.S. citizen.

**B.      Passenger Standing to Contest Search**

Warrantless searches of automobiles violate both the Fourth Amendment of the United States Constitution and Art. I, § 17 of the Idaho Constitution, unless a recognized exception to the warrant requirement is applicable. *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995); *State v. Foldesi*, 131 Idaho 778, 779, 963 P.2d 1215, 1216 (Ct. App. 1998). Consent to the search provides an exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Diaz*, 144 Idaho 300, 302, 160 P.3d 739, 741 (2007). The State must prove that any consent is voluntary rather than the result of duress or coercion, direct or implied. *Schneckloth*, 412 U.S. at 222. Consent may be expressed through words, gestures, or other conduct. *State v. Fleenor*, 133 Idaho 552, 555, 989 P.2d 784, 787 (Ct. App. 1999).

Generally, only the owner of a vehicle has standing to directly challenge an illegal search. *Rakas v. Illinois*, 439 U.S. 128 (1978). Idaho courts have consistently held that a passenger in a vehicle subject to an allegedly illegal search generally does not have standing to object to the search of the car. *State v. Ryan*, 117 Idaho 504, 788 P.2d 1327 (1990); *State v. Luna*, 126 Idaho 235, 880 P.2d 265 (Ct. App. 1994). A passenger who has no proprietary interest in the vehicle lacks a reasonable expectation of privacy, and therefore, standing to challenge a search where the driver has consented. *State v. Guzman*, 126 Idaho 368, 373, 883 P.2d 726, 731 (Ct. App. 1994). The rule is well established that in order to assert standing to suppress evidence, the individual seeking suppression must demonstrate some proprietary interest in the premises searched or some other interest giving a reasonable expectation of privacy. *Ryan*, 117 Idaho at 506-507, 788

P.2d at 1329-1330. The individual's rights must have been infringed. *Id.* These rights are personal and a claim may not be asserted vicariously that the government has invaded a third party's privacy rights. *Id.* Where a passenger fails to make a showing of a legitimate expectation of privacy, his Fourth Amendment rights have not been violated. *Rakas*, 439 U.S. at 148-49; *see also State v. Bottleson*, 102 Idaho 90, 625 P.2d 1093 (1981). Furthermore, the trunk of an automobile is not an area in which a passenger would normally have a legitimate expectation of privacy. *Rakas*, 439 U.S. at 148-49. Where a passenger, however, asserts ownership or a possessory interest in the vehicle, that passenger may have standing to object to the search, although ownership alone may not be determinative. *Foldesi*, 131 Idaho at 780-81, 963 P.2d at 1217-18; *State v. Troughton*, 126 Idaho 406, 410, 884 P.2d 419, 423 (Ct. App. 1994). Therefore, unless there is a valid challenge to the initial stop or the continued detention, the passenger is without standing to contest any subsequent search of the vehicle. *See Luna*, 126 Idaho at 236-38, 880 P.2d at 266-68.

Agent Shepard confirmed that Scheideman was the owner of the vehicle. Since we have determined that the stop was valid and the detention was lawful, Bordeaux is without standing to challenge the search of the vehicle. Although Bordeaux handed one of the officers a card expressing that Bordeaux did not waive his right to be free from a search of his vehicle, person, or property, Bordeaux, as the passenger, could not assert the driver's rights and the card was not a demonstration of an interest giving a reasonable expectation of privacy.

## III.

## CONCLUSION

The stop was made under a reasonable suspicion. The detention of Bordeaux was related to the purpose of the stop. The order denying Bordeaux's motion to suppress is affirmed.

Judge PERRY and Judge GUTIERREZ, **CONCUR.**